# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                    )
AMERICAN WILD HORSE                 )
PRESERVATION CAMPAIGN, *et al.*,    )
                                    )
            Plaintiffs,             )
                                    )
      v.                            )          Civil Action No. 14-0485 (ABJ)
                                    )
TOM VILSACK, Secretary,             )
U.S. Department of Agriculture, *et al.*,  )
                                    )
            Defendants.             )
_____)

## MEMORANDUM OPINION

Plaintiffs the American Wild Horse Preservation Campaign, Carla Bowers, and Return to Freedom have brought this action against the Secretary of the United States Department of Agriculture, Thomas J. Vilsack; the Chief of the United States Forest Service, Thomas Tidwell; and the Acting Director of the Modoc National Forest, Ann Carlson. Compl. [Dkt. # 1]. The case arises out of the Forest Service's 2013 management plan for the Devil's Garden Wild Horse Territory ("WHT"). *Id.*

The Devil's Garden WHT is a wild horse territory located in the Modoc National Forest in California. *Id.* ¶ 1. Plaintiffs acknowledge that the territory consisted of two separate, non-contiguous parcels when it was established in 1975. *Id.* ¶ 39. However, they allege that at some point in the 1980s, the Forest Service adjusted the borders of the WHT to create a larger, unified territory, and that these more expansive borders were also recognized in a 1991 forest plan. *Id.* ¶¶ 39–40. In this lawsuit, they claim that the Forest Service acted improperly in 2013, when it adopted a new management plan which delineated the territory's borders in accordance with the original 1975 layout and explained that any previous references to one contiguous territory were

the result of "administrative error."  *Id.* ¶¶ 3–4, 48–49.  The Forest Service also adjusted the territory's minimum wild horse population threshold, called the appropriate management level ("AML").  *Id.* ¶¶ 5–6, 51–52.  Plaintiffs allege that these decisions are contrary to multiple statutes and reflect arbitrary and capricious agency action in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).  *Id.* ¶¶ 58–91.

Plaintiffs' first set of challenges to the Forest Service's actions are premised upon their assertion that the disputed 25,000-acre parcel – which lies between the two original non-contiguous portions of the Devil's Garden WHT – was made an official part of the WHT at some point prior to 2013.  In its 2013 environmental assessment, the Forest Service explained that any previous drawings or plans that appeared to incorporate the parcel – and unite the territory's two non-contiguous halves – had done so in error.  The Court does not find this action to have been unreasonable or unlawful.  Plaintiffs have failed to demonstrate that the disputed parcel was ever formally incorporated into the Devil's Garden WHT through the required public process or that it could have been.  So they are unable to meet their burden to show that the record does not support the agency's 2013 decision to correct and clarify the boundaries.

With respect to the second issue raised in the complaint, the Forest Service has articulated a rational connection between the facts it found and its choice to broaden the AML range for the Devil's Garden WHT.  Thus, the Court finds that the challenged actions were not arbitrary and capricious or contrary to law, and it will grant defendants' cross-motion for summary judgment.

## BACKGROUND

The complaint recognizes that the Devil's Garden WHT consisted of two separate, non-contiguous parcels, totaling an estimated 236,000 acres, when it was established in 1975.  Compl. ¶ 39.  Plaintiffs allege that at some point in the 1980s, the Forest Service adjusted the borders of

2

the WHT to create one contiguous territory of roughly 258,000 acres.  *Id.*  Plaintiffs further claim that the Forest Service improperly revised those borders in 2013.  *Id.* ¶¶ 3–4.  They seek to vacate the Forest Service's clarification of the territorial borders and its simultaneous adjustment of the AML as arbitrary and capricious under the APA, and on the grounds that the agency's actions violated all of the applicable statutes.  *Id.* ¶ 8.

## I.     Statutory Framework

Three statutory schemes control the Forest Service's management of the Devil's Garden WHT and form the basis for plaintiffs' challenges to the decisions embodied in the 2013 environmental assessment and management plan:  the Wild Free-Roaming Horses and Burros Act ("Wild Horses Act"), 16 U.S.C. §§ 1331–1340, the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1687, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370.

The Wild Horses Act, passed in 1971, states that wild horses and burros "shall be protected from capture, branding, harassment, or death; and to accomplish this they are to be considered in the area where presently found, as an integral part of the natural system of the public lands."  16 U.S.C. § 1331.  The Act requires the Forest Service to "protect and manage" wild horse populations on lands under its administration in order to "achieve and maintain a thriving natural ecological balance."  *Id*. § 1333(a).  To manage the wild horses, the Forest Service has established wild horse and burro territories on "lands which were territorial habitat of wild free-roaming horses and/or burros at the time of the passage of the Act," and it develops and maintains a "management plan" for each territory.  36 C.F.R. §§ 222.60(b)(15), 222.61(3)–(4).  Each unit or subunit of a wild horse territory is assigned an appropriate management level, or AML, which represents the number of animals the territory can sustainably support.  16 U.S.C. § 1333(b)(1).

The National Forest Management Act requires the Forest Service to "develop, maintain, and, as appropriate, revise" a Land and Resource Management Plan (herein, a "forest plan") for all sections of the National Forest System. *Id.* § 1604(a). While a management plan under the Wild Horses Act applies to a specific wild horse and burro territory, a forest plan under the NFMA governs a particular unit of the National Forest System. The Forest Service may make non-significant amendments to a forest plan "in any manner whatsoever" after giving public notice. *Id.* § 1604(f)(4). However, significant amendments to a forest plan must undergo more extensive approval procedures and require greater public involvement. *Id.*

The National Environmental Policy Act requires all federal agencies to analyze the impact of any agency action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see also* 40 C.F.R. § 1508.27 (listing factors to be considered in reaching a determination of significance). Under NEPA, an agency must first prepare an environmental assessment ("EA"), which briefly discusses the environmental impacts of the proposed agency action and sets out "sufficient evidence and analysis for determining whether to prepare" one of two additional documents: an environmental impact statement ("EIS") or a finding of no significant impact ("FONSI"). 40 C.F.R. §§ 1501.4(b), 1508.9. If the agency finds, on the basis of the EA, that the proposed action will have a significant impact on the quality of the human environment, it must prepare an EIS, which examines five factors relevant to the cumulative environmental impact of the action. 42 U.S.C. § 4332(C). If, however, the agency finds that the action does not significantly affect the environment, it need only prepare a FONSI setting forth the reasons "why an action . . . will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." 40 C.F.R. § 1508.13; *see also id.* § 1501.4(b), (e).

II.     **History of the Devil's Garden WHT**

After the passage of the Wild Horses Act in 1971, the Forest Service established a wild horse territory at Devil's Garden, a large, flat plateau located within the Modoc National Forest in northeastern California.  *See* AR02969–70.[1]  The first formal Devil's Garden WHT management plan was issued in 1975.  AR02965–97 (the "1975 Management Plan").  It provided for a wild horse territory "broken into two large units which encompasses a gross acreage estimated at 236,000 acres."  AR02970–71.

The two ranges were separated by a strip of land that was not incorporated into the Devil's Garden WHT when it was established.  *See, e.g.*, AR00157 (depicting the "1975 Wild Horse Territory").  This strip, which the Court will refer to as the "disputed territory," consisted of the Triangle Ranch and Avanzino Ranch grazing lands, some of which were privately-owned.  *See, e.g.*, AR00156 ("The Avanzino and Triangle private ranch lands which lay in between the West and East home ranges were not included in the WHT.").  It also included portions of the Carr, Big Sage, and Timbered Mountain livestock grazing allotments.  *See, e.g.*, AR03927 (showing boundaries of grazing allotments in red and boundaries of Devil's Garden WHT in yellow).  In 1976, the Forest Service acquired the Triangle Ranch lands through a land exchange and incorporated them into the Modoc National Forest.  AR03965; AR03968.  However, the Forest Service did not make the Triangle Ranch lands part of the Devil's Garden WHT at that time.  *See* AR03998 (1979 Decision Notice stating that "Triangle is not part of a designated horse management unit").

---

1      The parties' Joint Appendix ("JA") of the Administrative Record in this case was filed in six parts due to the size of the files, and each page has been stamped with a Bates number.  *See* JA Part 1 [Dkt. # 29-1] (AR00001–695); JA Part 2 [Dkt. # 29-2] (AR00707–2201); JA Part 3 [Dkt. # 29-3] (AR02206–3658); JA Part 4 [Dkt. # 29-4] (AR03667–4217); JA Part 5 [Dkt. # 29-5] (pages AR04218–532); JA Part 6 [Dkt. # 29-6] (AR04533–762).  In referring to the Administrative Record, the Court will cite to the Bates numbers appearing at the bottom of each page.

The Forest Service revised the Devil's Garden WHT management plan in 1980, AR02949–64 (the "1980 Management Plan"), and again described the Devil's Garden WHT as a territory "broken into two large units which encompasses a gross acreage estimated at 236,000 acres." AR02953.  In 1982, the Forest Service issued another management plan, AR02839–51 (the "1982 Management Plan"), which again characterized the Devil's Garden WHT as a territory "broken into two large units which encompasses a gross acreage estimated at 236,000 acres."  AR02843.[2]

In 1991, the Forest Service revised the forest plan for Modoc National Forest.  AR02838 (the "1991 Forest Plan").[3]  It incorporated by reference all existing resource management plans that it found to be consistent with, and appropriate for, the 1991 Forest Plan, which included the existing Wild Horse Management Plan.  *Id.* at 1-1.  But this time, the 1991 Forest Plan stated that the Modoc National Forest "has one wild horse territory of about 258,000 acres," *id.* at 3-18, and it observed that "[u]nder the Wild Horses and Burros Act, the Forest is legally obligated to manage horses within [that] 258,000-acre wild horse territory."  *Id.* at 3-17.  The plan included a statement that the Forest Service "prepared the Wild Horse Management Plan in 1985,"[4] which had "identifie[d] a population objective of 275–335 animals to manage."  *Id.* at 3-18 to 3-19.

In July 2011, the Forest Service issued a scoping notice, seeking comments on proposed updates to the existing Devil's Garden WHT management plan, including an adjustment to the

---

2      The Forest Service issued a management plan in 1981, but the version that was made part of the Joint Appendix in this case appears to be incomplete.  *See* AR02941–48.

3      Unlike the remainder of the Joint Appendix, the 1991 Forest Plan does not have Bates numbers at the bottom of each page.  Instead, it contains chapter and page numbers inherent to the original document.  Thus, the Court will cite to the chapter and page numbers that appear at the bottom of each page of the 1991 Forest Plan.

4      The record does not contain any 1985 management plan.  As discussed below, *see infra* note 7, it appears that the 1991 Forest Plan's reference to a 1985 management plan was a mistake, and that the Forest Plan most likely was referring instead to the 1982 Management Plan.

AML range of 275 to 335 animals established in the 1991 Forest Plan.  AR03911–20.  The scoping

notice stated that the Devil's Garden WHT "is approximately 268,750 acres in size," AR03911,

and it included a map depicting one contiguous territory.  AR03919–20.

In August 2012, the Forest Service entered into a cost-sharing agreement with the Modoc

County Farm Bureau ("Farm Bureau") for the development of the new Devil's Garden WHT

management plan.  AR04700–23.  The Farm Bureau agreed to collect, summarize, and evaluate

all data, prepare the draft EA and the final EA, and provide support for any appeal.  AR04713.

The Forest Service was to supervise the Farm Bureau's specialists, employ its own specialist to

review the specialists' reports, review and comment on the draft EA, and prepare the notice of

decision and any finding of no significant impact.  AR04714.

The Forest Service issued another scoping notice in December 2012, AR03809, and

attached a proposed action to that notice.  AR03810–24 (the "Proposed Action").  In the Proposed

Action, the Forest Service described the Devil's Garden WHT as consisting of "approximately

232,520 acres of federal land."  AR03810.  It also stated that "[t]he territory comprised West and

East home ranges in the areas where it was known that wild free-roaming horses ranged in 1971,"

and that "[t]he Avanzino and Triangle private ranch lands which lay in between the West and East

home ranges were not included in the WHT."  AR03811.

The Proposed Action also recognized that "[d]uring the mid-1980's, the [Forest Service]

appears to have adjusted the WHT boundary for administrative convenience," incorporating the

disputed territory into the WHT, "including Triangle Ranch lands acquired in 1976 and the

Avanzino Ranch (41 percent of which remains in private ownership)."  *Id.*  It stated that "[a]n

administrative error was made in expanding the WHT beyond the herd's known territorial limits,"

and it added that the "[i]nclusion of the Triangle Ranch lands . . . was clearly in error."  AR03812.

The Forest Service therefore "propose[d] to return to the management of wild horses within the WHT boundary established in 1975," which did not include the disputed territory. *Id.* The Proposed Action also included a proposal to amend the 1991 Forest Plan to remove the fixed AML range of 275 to 335 animals and to establish the AML range in the WHT management plan instead, which would be updated as necessary when wild horse population and resource monitoring data suggested the existing AML range was no longer appropriate. AR03815.

Also in December 2012, the Forest Service released the Resource Monitoring Report for the Devil's Garden WHT, AR00622–95, in which it again characterized the territory as consisting of two non-contiguous parcels. *See* AR00627 (discussing "the approximately 232,521 acre Devil's Garden Plateau Wild Horse Territory" with map depicting two separate territories).

One month later, in January 2013, the Forest Service published a report evaluating the monitoring data collected to establish a new AML range for the Devil's Garden WHT. AR00542–621 (the "AML Evaluation"). This document also stated that the inclusion of the disputed territory in the Devil's Garden WHT was the "result of an administrative error," and it noted that "the AML was established as 0 wild horses" for the disputed territory. AR00547. The AML Evaluation went on to recommend an AML of 206 to 402 horses for the two-unit WHT, with an AML range of 105 to 183 horses on the Western portion and 101 to 219 horses on the Eastern portion. AR00552.

In April 2013, the Forest Service released the draft EA for the proposed changes to the management of the Devil's Garden WHT. AR03453–658 (the "Draft EA"). The Draft EA stated that the Devil's Garden WHT "comprises approximately 232,520 acres of federal land," AR03459, and like the Proposed Action, it recognized that the boundary of the Devil's Garden WHT appeared to have been adjusted "for administrative convenience" during the 1980s as a result of "an

8

administrative error."   AR03462; AR03465.   It proposed "to return to the management of wild horses within the WHT boundary established in 1971."   AR03465.

After a notice and comment period, in which plaintiffs participated, *see* AR03333–54, the Forest Service published its final EA in August 2013.   AR00146–386 (the "Final EA").   The Final EA once again stated that the inclusion of the disputed territory in the Devil's Garden WHT had been "[a]n administrative error," and it described the total acreage of the Devil's Garden WHT as 232,520 acres of federal land, and not the larger 258,000 acres that would include the disputed territory.   AR00154–59.   It proposed establishing an AML of 206 to 402 wild horses for the Devil's Garden WHT, and "return[ing] to the management of wild horses within the WHT boundary established in 1971."   AR00153; AR00159.   The Final EA also responded to plaintiffs' comments opposing the boundary correction, explaining that "the 1991 Forest Plan erroneously included" the disputed territory as within the boundaries of the Devil's Garden WHT.   AR00373–74.

Incorporating the Final EA by reference, the Forest Service published its Decision Notice and FONSI in August 2013, AR00100–13 ("Decision Notice & FONSI"), in which it found that the boundary correction and the AML adjustment would "not have a significant effect on the quality of the human environment."   AR00106.   It formally adopted the proposed action set forth in the Final EA, AR00100, which delineated the boundary of the Devil's Garden WHT to be consistent with its original form, with two non-contiguous territories totaling approximately 232,520 acres, and which revised the AML range to 206 to 402 horses.   *See* AR00153; AR00159.   Along with the Decision Notice and FONSI, the Forest Service issued a new management plan, which incorporated the new AML range and adopted the territorial boundary as it was established in the 1975 Management Plan.   AR00114–45 (the "2013 Management Plan").

### III.    Procedural History

During the administrative process, plaintiffs the American Wild Horse Preservation Campaign ("AWHPC") and Bowers provided comments on both scoping notices and the Draft EA. *See* AR00315; AR00318–19; AR00353–54.  In October 2013, after the release of the Decision Notice and FONSI, the Final EA, and the 2013 Management Plan, plaintiffs AWHPC and Bowers filed a timely administrative appeal.  AR00068–94.  In January 2014, the Appeal Deciding Officer affirmed the Forest Service's actions.   AR00001–03.    This decision constituted the final administrative determination in this matter.  AR00003.

Plaintiffs initiated this action on March 24, 2014.  Compl.  They bring six claims against defendants, all under the APA.  In Counts I, II, and III, plaintiffs allege that the boundary clarification was arbitrary and capricious because it violated the Wild Horses Act, the NFMA, and NEPA, and in Counts IV, V, and VI, they claim that the adjustment to the AML range was arbitrary and capricious because it was contrary to the same three statutes.  *Id.* ¶¶ 58–91.

Plaintiffs filed the instant motion for summary judgment on November 17, 2014.  Pls.' Mot. for Summ. J. [Dkt. # 20] ("Pls.' Mot."); Mem. in Supp. of Pls.' Mot. [Dkt. # 20] ("Pls.' Mem.").  Defendants filed a cross-motion for summary judgment on January 12, 2015.  Defs.' Mot. for Summ. J. [Dkt. # 22] ("Defs.' Mot."); Mem. in Supp. of Defs.' Mot. [Dkt. # 22] ("Defs.' Mem.").  The same day, the intervenor-defendants – private landowners with land near the Devil's Garden WHT and users of public land resources within the Modoc National Forest – filed their cross-motion for summary judgment.  Intervenor-Defs.' Mot. for Summ. J. ("Intervenor-Defs.' Mot.") [Dkt. # 24]; Mem. in Supp. of Intervenor-Defs.' Mot. & in Opp. to Pls.' Mot. ("Intervenor-Defs.' Mem.") [Dkt. # 24-1].  All motions have been fully briefed.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in cases involving review of agency action under the APA, Rule 56 "does not apply because of the limited role of a court in reviewing the administrative record." *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011).

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in excess of statutory authority, or "without observance of procedure required by law." 5 U.S.C. § 706(2). However, the scope of review is narrow. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The review is "[h]ighly deferential" and it "presumes the validity of agency action." *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000). A court must not "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. Thus, the action will be upheld if the agency "has considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007), quoting *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 68 (D.C. Cir. 2000). Agency action will be overturned only if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*State Farm*, 463 U.S. at 43.

In reaching its decision, the agency may rely on comments submitted during the notice and comment period as justification for the action, so long as they are examined critically. *See Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095, 1124 (D.C. Cir. 1984). It "need not – indeed cannot – base its every action upon empirical data; depending upon the nature of the problem, an agency may be 'entitled to conduct . . . a general analysis based on informed conjecture.'" *Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 142 (D.C. Cir. 2005), quoting *Melcher v. FCC*, 134 F.3d 1143, 1158 (D.C. Cir. 1998).

## ANALYSIS

I.    **The Forest Service's decision to correct the boundaries of the Devil's Garden WHT was not arbitrary and capricious or in violation of the Wild Horses Act, the NFMA, or NEPA.**

In Count I, plaintiffs contend that when the Forest Service corrected the boundaries of the Devil's Garden WHT in the 2013 Management Plan, it disregarded the requirement in the Wild Horses Act that it protect and manage wild horses within the disputed territory. Compl. ¶¶ 58–63. In Count II, plaintiffs claim that the Forest Service violated the National Forest Management Act because it ignored a mandate in the 1991 Forest Plan that the Devil's Garden WHT consist of one single, contiguous wild horse territory. *Id.* ¶¶ 64–68. And in Count III, plaintiffs allege that the Forest Service failed to analyze the environmental impact of eliminating the disputed territory in developing the 2013 EA and the FONSI, in violation of the National Environmental Policy Act. *Id.* ¶¶ 69–74. They argue that the Forest Service's failure to comply with these statutes renders the 2013 decision to clarify the boundaries of the Devil's Garden WHT invalid under the APA.

But all of these counts presuppose that the disputed territory was in fact incorporated into the Devil's Garden WHT at some point during the 1980s, or in the 1991 Forest Plan. This premise fails for two reasons, and in sections I.A.1 and I.A.2 below, the Court will take up this defect that

is fatal to each of plaintiffs' three claims, before addressing the specific statutory claims individually in sections I.B, I.C, and I.D.

First, as will be set out in more detail in section I.A.1, plaintiffs can point to nothing in the Administrative Record showing that an actual incorporation ever took place.  No formal process was invoked, and there is no record of any official decision.  To the extent that the 1980 Map or the 1991 Forest Plan did refer to a single, contiguous WHT that incorporated the disputed territory, there is nothing in the record that casts doubt on defendants' explanation that this was the result of an "administrative error" and that it did not affect the actual management of the Devil's Garden WHT.

Second, as discussed in section I.A.2, it would not have been legally proper or possible to subsume the disputed central parcel into the Devil's Garden WHT and create a unified whole, because a significant portion of the disputed territory was, and remains, privately owned, and the Forest Service determined that it was not the territorial habitat of wild horses at the time the Wild Horses Act was passed.  So the land could not lawfully have been deemed to be a part of the wild horse territory under the applicable statutes.

For these reasons, the Court finds that it was not arbitrary and capricious for the Forest Service to address the administrative error in the 2013 EA and Management Plan, and it finds that the boundary correction was not contrary to any of the three statutes or the APA.  In other words, in the absence of any indication that the creation of a map that failed to exclude the parcel in the 1980s, or the use of those boundaries in a forest plan in the 1990s, was the product of a deliberate decision to expand and unify the territory, it was reasonable for the agency entrusted with these matters to conclude that a mistake had been made that needed to be rectified.  Therefore, defendant's cross-motion for summary judgment on Counts I, II, and III will be granted.

A.   **The Forest Service reasonably concluded that the disputed territory was never formally incorporated into the Devil's Garden WHT and that any reference to a single, contiguous territory was the result of an administrative error.**

Plaintiffs concede that the disputed territory was not part of the Devil's Garden WHT when it was first created in 1975.  Compl. ¶ 39; Pls.' Mem. at 5; *see also* AR00157.  However, they claim that "[t]he Forest Service acted quickly to incorporate the [disputed territory] into the WHT," and that "[a]t some point in the early 1980s, the Forest Service formally modified the boundary of the WHT to include the newly acquired public lands as well as existing public lands in one contiguous WHT."  Pls.' Mem. at 5–6.

Plaintiffs acknowledge, as they must, that they cannot identify any document in the Administrative Record that memorializes such an action or shows exactly when or how the alleged incorporation took place.  *See id.* at 6 n.2 ("While the exact date of the change is not known, it appears to have occurred sometime in the early 1980s.").  They rely on a 1980 map and the 1991 Forest Plan to support their claim that the disputed territory was incorporated into the Devil's Garden WHT "at some point in the early 1980s." *Id.* at 5–6, 9–10.  But the Court is not authorized to undertake its own investigation into whether the disputed territory was in fact made part of the Devil's Garden WHT at any point during the relevant time period.  Instead, the Court is limited to reviewing the Forest Service's conclusion that the references to a single, contiguous wild horse territory were the result of "[a]n administrative error," *see* AR00159, and determining whether that 2013 conclusion was consistent with the evidence before the agency at the time the decision was made.  The Court finds that it was.

1.    **The Forest Service's conclusion that the references to a single, contiguous territory were the result of an administrative error is not counter to the record evidence.**

The Court begins with the 1980 map, which was included as part of the 2013 EA and does not appear separately in the record.  *See* AR00158 (the "1980 Map").  Although the 1980 Map itself is not dated, it is captioned within the 2013 EA as "Figure 2:  1980 Wild Horse Territory." *Id.*  Plaintiffs contend that it shows that "[a]t some point in the early 1980s, the Forest Service formally modified the boundary of the WHT to include the newly acquired public lands as well as existing public lands in one contiguous WHT."  Pls.' Mem. at 5–6.

The Forest Service disputes this.  The 2013 EA stated that at some point in the mid-1980s, the Forest Service "appears to have adjusted the WHT boundary for administrative convenience," referring to the 1980 Map.  AR00156.  It added, though, that "[a]n administrative error was made in expanding the WHT beyond the herd's known territorial limits," and it noted that the "[i]nclusion of the Triangle Ranch lands . . . was clearly in error."  AR00159.  Defendants now further explain that the 1980 Map was created "[t]o keep track of wild horses roaming outside of the territory in the 1980s."  Defs.' Mem. at 11.  They state that the 1980 Map was designed to enable the Forest Service "to administratively manage horses that had exceeded the actual Territory boundaries," Reply in Supp. of Defs.' Mot. [Dkt. # 27] ("Defs.' Reply") at 4, and so, it "depicted the general location of these horses" across "a continuous area," "includ[ing] non-territory lands and significant private lands . . . where horses had been observed in the 1980s." Defs.' Mem. at 11–12.  Thus, defendants contend, "the inclusion of [the disputed territory] in the 1980s map was for administrative convenience and did not formally change the territory boundary established in 1975."  Defs.' Reply at 11; *see also* Defs.' Mem. at 12 ("This map was not approved in any wild horse territory plan.").

The Court finds the Forest Service's explanation of the origin of the 1980 Map and its statement that the disputed territory was included in the map for "administrative convenience" to be reasonable and consistent with record evidence.  At a minimum, the 1980 Map certainly does not show, as plaintiffs claim, that "[a]t some point in the early 1980s, the Forest Service formally modified the boundary of the WHT" to include the disputed territory.  *See* Pls.' Mem. at 5.  And there are no other records that reflect any "formal" process at all.  Indeed, the Forest Service could not have amended an existing management plan solely by creating a map changing the borders of the Devil's Garden WHT – the Wild Horses Act and the NFMA require the creation of a management plan or a forest plan to direct the management of a wild horse or forest territory.[5]  *See* 16 U.S.C. § 1604(a); 36 C.F.R. § 222.61(a)(4).  And plaintiffs cannot point to any formal plan implementing a territorial change.

In addition, the 1980 Map is inconsistent not only with the ownership of the land, which will be discussed in section I.A.2 below, but also with the management plans that were in existence around the time it was created.  While the 1980 Map depicts one contiguous horse range which includes the disputed territory, both the 1980 Management Plan and the 1982 Management Plan unequivocally refer to the Devil's Garden WHT as a territory "broken into two large units which encompasses a gross acreage estimated at 236,000 acres."  *Compare* AR00158 (the 1980 Map) *with* AR02953 (the 1980 Management Plan) *and* AR02843 (the 1982 Management Plan).  The Administrative Record also contains a map prepared in connection with an April 1990 wild horse

---

5       Plaintiffs' position is somewhat inconsistent on this point.  They complain that defendants improperly altered the boundaries of the Devil's Garden WHT through the 2013 EA "without going through the formal Forest Plan amendment or revision process."  Compl. ¶ 65.  But they appear to be asking the Court to assume that the Forest Service simply increased the size of the Devil's Garden WHT either through the creation of the 1980 Map along those boundaries or by incorporating that map by reference in the 1991 Forest Plan, without undertaking any "formal Forest Plan amendment or revision process."  *Id.*

inventory that depicts the WHT in a two-part configuration, with the disputed territory excluded. AR03934–35.  In other words, well after the time that plaintiffs contend that the 1980 Map shows that the Forest Service officially expanded the Devil's Garden WHT, the Forest Service continued to treat the territory as consisting of two separate and non-contiguous ranges which did not include the disputed territory.  Thus, the Court finds that it was not arbitrary and capricious for the Forest Service to determine that the 1980 Map was created for "administrative convenience" and that it does not reflect a formal adjustment of the boundaries of the WHT.[6]

Plaintiffs also rely on the 1991 Forest Plan in support of their claim that the disputed territory was incorporated into the Devil's Garden WHT in the 1980s.  Pls.' Mem. at 9–10, 36–38. While the 1991 Forest Plan does refer to the WHT as a contiguous whole, the Forest Service explained in the 2013 EA that "[a]n administrative error was made in expanding the WHT beyond the herd's known territorial limits," and it added that the "[i]nclusion of the Triangle Ranch lands (which were not acquired by the Forest Service until 1976, nearly five years after the 1971 [Wild Horses Act] passed)," and the inclusion of the Avanzino Ranch lands, of which 41 percent remained privately owned, "was clearly in error."  AR00156; AR00159.  It further emphasized that "an AML was not established for the added lands and few, if any, wild horses were found there."  AR00156; AR00159.  Defendants now reiterate that the 1991 Forest Plan's reference to a

---

6      The Court notes that this is not a situation in which the agency's counsel advanced a litigating position that is contrary to, or inconsistent with, the position put forth by the agency during the administrative process.  *Cf. State Farm*, 463 U.S. at 50 (stating that "the courts may not accept . . . counsel's *post hoc* rationalizations for agency action" where "the agency submitted no reasons at all" during the administrative process for rejecting an alternative approach), citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).  Here, the Court finds that the explanation proffered by defendants regarding the "administrative error" is consistent with the rationale offered by the agency in the 2013 EA and with the evidence in the record.

single, contiguous wild horse territory was "clearly an error as the Forest Service never designated or managed this non-territory for wild horses." Defs.' Mem. at 1–2.

The Court finds the Forest Service's explanation of the administrative error and its conclusion that the 1991 Forest Plan does not demonstrate that the disputed territory was ever formally incorporated into the Devil's Garden WHT to be reasonable and consistent with the record evidence. The 1991 Forest Plan referred twice to a single, contiguous, 258,000-acre wild horse territory. *See* 1991 Forest Plan at 3-17 ("[T]he Forest is legally obligated to manage horses within a 258,000-acre wild horse territory."); *id.* at 3-18 ("[T]he Forest has one wild horse territory of about 258,000 acres."). But it does not contain any map of the Devil's Garden WHT, let alone a map depicting one contiguous territory, that could provide a source for that acreage figure.

And more importantly, the plan is internally inconsistent in referring to the boundaries and acreage of the Devil's Garden WHT. For example, the 1991 Forest Plan stated that it "will supersede most previous Forest resource management plans." *Id.* at 1-1. But it then noted that "[a]ll existing resource management plans were re-examined by the Forest's interdisciplinary planning team," and it stated that the planning team found the "Wild Horse Management Plan" to be "consistent with, and still appropriate for, the Forest Plan." *Id.* Thus, the 1991 Forest Plan stated that it "incorporated by reference" the existing wild horse management plan. *Id.* And that

18

plan – the 1982 Management Plan[7] – referred unambiguously to a territory "broken into two large

units which encompasses a gross acreage estimated at 236,000 acres."

In other words, the 1991 Forest Plan referred to a contiguous 258,000 acre horse territory

while simultaneously incorporating a management plan that provided for a non-contiguous, two-

---

[7]    As noted above, *see supra* note 4, the 1991 Forest Plan referred elsewhere to a 1985 management plan that is not contained in the Administrative Record. *See* 1991 Forest Plan at 3-18 to 3-19 ("[T]he Forest prepared the Wild Horse Management Plan in 1985 . . . ."). *But see* AR00159 (2013 EA listing previous management plans as those "developed . . . in 1975, 1980, and 1982"). Defendants assert that this reference was a typographical error, and that the 1991 Forest Plan must have been referring instead to the 1982 Management Plan, the plan in place at that time. Defs.' Mem. at 12 & n.7; Defs.' Reply at 5; *see also* Intervenor-Defs.' Reply in Opp. to Pls.' Mot. [Dkt. # 28] at 12. Plaintiffs, for the first time in their reply, assert that the 1991 Forest Plan's reference to a 1985 management plan was not a typographical error, and that it is instead evidence that there is an additional Devil's Garden WHT management plan missing from the record that would support plaintiffs' position regarding the incorporation of the disputed territory. *See* Reply in Supp. of Pls.' Mot. [Dkt. # 25] ("Pls.' Reply") at 17. Plaintiffs did not raise the issue of a missing management plan during the administrative process, *see, e.g.*, AR00068–94; *see also* Defs.' Reply at 6, and they have thus waived this argument. *See, e.g.*, *U.S. Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764–65 (2004) (finding that respondents "forfeited any objection" to an EA that they failed to raise in their comments to the rulemaking).

        And in any event, judicial review of an agency action under the APA is limited to the administrative record that was before the agency at the time it made its decision. *See* 5 U.S.C. § 706; *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996); *see also Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam) ("In applying [the abuse of discretion] standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."). That record must include "all documents and materials that the agency directly or indirectly considered" and "neither more nor less." *Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196 (D.D.C. 2006) (citations and internal quotation marks omitted). "[A]n agency is entitled to a strong presumption of regularity, that it properly designated the administrative record." *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006); *see also LeBoeuf, Lamb, Greene & MacRae, LLP v. Abraham*, 347 F.3d 315, 320 (D.C. Cir. 2003). "[T]o rebut the presumption of regularity," a party must "introduce non-speculative, concrete evidence to support their belief that the specific documents allegedly missing from the administrative record were directly or indirectly considered by the actual decision makers involved in the challenged agency action." *Dist. Hosp. Partners, LP v. Sebelius*, 971 F. Supp. 2d 15, 20 (D.D.C. 2013), *aff'd sub nom. Dist. Hosp. Partners, LP v. Burwell*, 786 F.3d 46 (D.C. Cir. 2015). Other than the singular reference to a 1985 management plan in the 1991 Forest Plan, plaintiffs have provided no such evidence here. So the Court will afford defendants the presumption of regularity to which they are entitled and treat the 1982 Management Plan as the operative management plan in place at the time of the 1991 Forest Plan.

part horse territory of 236,000 acres as "consistent with, and still appropriate for, the Forest Plan." 1991 Forest Plan at 1-1. This internal inconsistency undermines plaintiffs' insistence that the 1991 Forest Plan recognized that the disputed territory was added to the Devil's Garden WHT "[a]t some point in the early 1980s," Pls.' Mem. at 5, and it belies the notion that the 1991 Forest Plan was the document through which a formal incorporation was effectuated.

There is additional evidence in the record supporting the Forest Service's conclusion that the reference in the 1991 Forest Plan was an administrative error, and that evidence contradicts plaintiffs' assertion that "the Forest Service managed the WHT as a single, contiguous 258,000-acre protected area from roughly 1980 to 2013." *See* Pls.' Mem. at 1. The record reflects that "an AML was not established" for the disputed territory in the 1991 Forest Plan. AR00156; *see also* AR00547 (2013 AML Evaluation noting that "[a]lthough the Triangle and Avanzino Ranch lands were included in the WHT boundary in the Forest Plan as a result of an administrative error, the AML was established as 0 wild horses for the two areas"). That means that no wild horses were intended to reside there, even at the time plaintiffs contend that it was part of the WHT. And the management level for the disputed territory remained at zero throughout the relevant period. For example, two wild horse inventories from 2002 and 2010 demonstrate that the designated management herd minimum size for the Avanzino grazing allotment – which falls completely and exclusively within the disputed territory, *see* AR03927 – was set at zero. AR04323; AR04325.

Consistent with its conclusion that the disputed territory was never properly incorporated into the Devil's Garden WHT, the Forest Service removed horses from the disputed territory throughout the relevant period. *See* AR00255 (table showing number of animals gathered between 2003 and 2013 from grazing allotments that overlap with the disputed territory, including Timbered Mountain, Big Sage, Carr, Triangle, and Boles); AR03933 (1990 recommendation that

wild horses be captured and removed from Boles Meadow).  In other words, well after plaintiffs contend that the disputed territory was incorporated into the Devil's Garden WHT, and despite the reference in the 1991 Forest Plan to a single, contiguous wild horse territory, the Forest Service was removing horses from the disputed territory and treating it as distinct from the Devil's Garden WHT.  Thus, the Court finds that the Forest Service's conclusion that any references to a single WHT were the result of administrative error was reasonable and consistent with the evidence before the agency.

> **2.    The disputed territory could not have been properly incorporated into the Devil's Garden WHT.**

As further support for their position, defendants argue that the disputed territory could not have been properly incorporated into the Devil's Garden WHT in any event.  *See* Defs.' Mem. at 2, 19–22; *see also* Intervenor-Defs.' Mem. at 8–11, 13–14.  The Court agrees.

The implementing regulations for the Wild Horses Act define "[w]ild horse and burro territory" as "lands of the National Forest System which are identified . . . as lands which were territorial habitat of wild free-roaming horses and/or burros *at the time of the passage of the Act*." 36 C.F.R. § 222.60(b)(15) (emphasis added).  The Forest Service has interpreted this to mean that only public lands that were home to wild horses at the time of the passage of the Act in December 1971 could qualify for inclusion in a wild horse territory.  *See* AR00159 (concluding that under the Wild Horses Act, the Forest Service's authority to direct "the management of wild horses and burros is limited to the areas where wild horses and burros were found in 1971"), citing 36 C.F.R. § 222.60(b)(13); *see also* 36 C.F.R. § 222.60(b)(14) ("Wild-horse and burro range means an area of National Forest System specifically so designated . . . for the purpose of sustaining an existing herd or herds of wild free-roaming horses and burros, provided the range does not exceed known territorial limits . . . .").

At the time of the passage of the Wild Horses Act, significant portions of the disputed territory were privately held and would not have qualified for inclusion in the WHT.  For example, the Triangle Ranch lands were privately owned until 1976, when the Forest Service acquired them in a land exchange, AR03965, and as plaintiffs acknowledge, approximately 41 percent of the Avanzino Ranch lands were privately held in 1971 and remain privately held to this day.  Pls.' Mem. at 7, citing AR00156.  Thus, these lands are disqualified from inclusion in the Devil's Garden WHT as a matter of law, since the Forest Service can only designate public lands – "lands of the National Forest System" – as wild horse and burro territory.  *See* 36 C.F.R. § 222.60(b)(15).

Furthermore, the disputed territory does not consist of "lands which were the territorial habitat of wild free-roaming horses and/or burros at the time of the passage of the Act."  *Id.*  The 1975 Management Plan did not include the disputed territory as part of the Devil's Garden WHT, and neither did the 1980 or 1982 Management Plans.  *See* AR02965–97; AR02949–64; AR02839–51.  And the 2013 EA notes that the 1975 Management Plan recognized that "the Avanzino and Triangle Ranch lands were specifically excluded" from the Devil's Garden WHT because "[l]ittle or no use by wild horses of these areas occurred during this time due to the number of fences and the ongoing livestock operations on this privately owned land."  AR00373; *see also* AR03995 (map showing boundary fences in the disputed territory in 1979).  In other words, at the time the Devil's Garden WHT was established, the Forest Service concluded that the disputed territory did not qualify as the territorial habitat of wild free-roaming horses.

Plaintiffs contend the disputed territory "is, and always has been, prime wild horse habitat." Pls.' Mem. at 27.  In support, they rely on the testimony of Marla Bennett, an employee of the U.S. Fish and Wildlife Service with experience studying and gathering wild horses on the Sheldon

National Wildlife Refuge in Nevada.[8]   *Id.* at 10–11, citing AR04131–38; *see also* Reply in Supp. of Pls.' Mot. [Dkt. # 25] ("Pls.' Reply") at 18–20.   Bennett concluded that wild horses likely would have used the disputed territory for grazing and migratory behaviors at the time the Wild Horses Act was passed.   AR04136–37.   But unlike the Forest Service employees who drafted and implemented the original 1975 Management Plan near the time of the passage of the Wild Horses Act, Bennett based her conclusion on visits to the disputed territory decades after the Act was passed and her observation of two recent wild horse gathers on the Devil's Garden WHT.   *See* AR04131–32.   The Court finds that this testimony is of little use in answering the question of whether the disputed territory was the "territorial habitat of wild free-roaming horses and/or burros *at the time of the passage of the Act*."   36 C.F.R. § 222.60(b)(15) (emphasis added).   In any event, "an agency must have discretion to rely on the reasonable opinions of its own qualified experts," *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989), and the Forest Service's determination in 1975 that the disputed territory was not a territorial habitat of wild horses is entitled to deference.

Based on all of these facts and circumstances, the Court finds that the Forest Service has articulated a rational connection between its finding that the references in the 1980 Map and the 1991 Forest Plan to a single, contiguous 258,000-acre territory were the result of administrative error, and its choice in the 2013 EA and the 2013 Management Plan to specify that the correct boundaries of the Devil's Garden WHT are those first established for the territory in 1975.   As discussed below, this finding is fatal to plaintiffs' first three challenges under the APA.

---

8      Bennett's declaration was submitted as part of plaintiffs' administrative appeal in 2013 and is part of the Administrative Record in this case.   *See* AR04131–38.

**B.** **The Forest Service reasonably determined that it was under no obligation to manage wild horses outside the Devil's Garden WHT.**

In Count I, plaintiffs contend that the Forest Service violated the Wild Horses Act by failing to protect and manage wild horses as "integral components" of the disputed territory, by conducting management activities within the disputed territory above the "minimal feasible level," and by declining to continue the recognition of the disputed territory as a wild horse territory. Pls.' Mem. at 25–29.

Since the Court finds that the Forest Service reasonably concluded that the disputed territory was never formally incorporated into the Devil's Garden WHT, it follows that the Forest Service was not required to manage wild horses on, or to treat them as integral components of, the disputed territory. Further, the Forest Service was not obligated to conduct management activities within the disputed territory "at the minimal feasible level." *See* 16 U.S.C. § 1333(a). Plaintiffs contend that "the Forest Service seeks to permanently abandon its responsibility to manage the [disputed territory] as part of the WHT" and "permanently remove the protected status" from the disputed territory. Pls.' Mem. at 28. But if the disputed territory was never formally incorporated into the Devil's Garden WHT in the first place, the Forest Service was not required to manage the territory as such, and it did not have a duty to treat the disputed territory as a protected area.[9] And

---

9       The case upon which plaintiffs rely in support of this claim is inapposite. *See* Pls.' Mem. at 28, citing *Colo. Wild Horse & Burro Coal., Inc. v. Salazar*, 639 F. Supp. 2d 87 (D.D.C. 2009). In that case, the Bureau of Land Management ("BLM") sought to remove an entire herd of horses from the West Douglas Herd Area and put them into "private adoption or long-term care," without first finding that the herd represented "excess animals" subject to removal. *Salazar*, 639 F. Supp. 2d at 95–96. The court found that the BLM had exceeded its authority because "Congress did not authorize BLM to 'manage' the wild horses by corralling them for private maintenance or long-term care as *non*-wild free-roaming animals *off* of the public lands." *Id.* at 96. Here, as the Court has already determined, the Forest Service reasonably concluded that the disputed territory was never part of the Devil's Garden WHT, and so it cannot be said to be removing wild horses from an existing wild horse habitat, as the BLM sought to do in *Salazar*.

finally, the Forest Service was not obligated to continue recognition of the disputed territory as a wild horse habitat, since the Forest Service never formally established it as a wild horse territory and it never determined that wild horses were "part of the natural system" in that area. *See* 36 C.F.R. § 222.61(a)(3) (requiring the Forest Service to "[e]stablish wild horse and burro territories in accordance with the Act and continue recognition of such territories where it is determined that horses and/or burros will be recognized as part of the natural system").

For those reasons, the Court finds that the Forest Service did not violate the Wild Horses Act when it corrected the boundaries of the Devil's Garden WHT in the 2013 EA and the 2013 Management Plan, and defendants are therefore entitled to summary judgment on Count I.

**C.     The Forest Service reasonably determined the boundary adjustment was not a "significant" amendment under the NFMA.**

The National Forest Management Act states that "instruments for the use and occupancy of National Forest System lands shall be consistent with" forest plans developed for the same area. 16 U.S.C. § 1604(i).  Plaintiffs contend that the 2013 EA and the 2013 Management Plan are inconsistent with the 1991 Forest Plan because they ignore its mandate that the Devil's Garden WHT be managed as a single, contiguous 258,000-acre horse territory. Pls.' Mem. at 36–38. Further, because plaintiffs claim that the purported elimination of the disputed territory from the Devil's Garden WHT was a "significant" change in the management of the territory, they allege that the Forest Service was required to go through the formal NFMA process to amend the 1991 Forest Plan, which it failed to do. *Id.*

Under the NFMA, the Forest Service is permitted to make non-significant amendments to the Forest Plan "in any manner whatsoever after final adoption after public notice," while significant amendments require a lengthier and more involved public approval process.  16 U.S.C. § 1604(f)(4).  An agency may rely on its own regulations for guidance in determining whether an

action is significant.  *See, e.g.*, *Hammond v. Norton*, 370 F. Supp. 2d 226, 262–63 (D.D.C. 2005).

The Forest Service Manual states that an amendment to a forest plan is significant if it would

"significantly alter the long-term relationship between levels of multiple-use goods," or "have an

important effect on the entire [forest] plan."  AR00162.  As for a boundary adjustment, an

amendment is not significant if it does not cause "significant changes in the multiple-use goals and

objectives for long-term land and resource management."  *Id*.

In the 2013 EA, the Forest Service examined whether the proposed boundary correction

would constitute a significant amendment, and it reached the following conclusion:

> The proposed amendment which would manage wild horses within the
> territorial limits established in the 1975 Wild Horse Management Plan
> would not alter the multiple-use goals and objectives of the Forest Plan.
> Appropriate management of wild horses to meet the goals and objectives
> identified in the Forest Plan would occur.  The proposed change would bring
> the Forest Plan into alignment with the 1971 [Wild Horses Act] and would
> not be NFMA significant.

*Id.*

The Court finds that this conclusion was reasonable.  It has already determined that the

Forest Service was managing the Devil's Garden WHT consistently with the 1982 Management

Plan, which provided for a territory "broken into two large units which encompasses a gross

acreage estimated at 236,000 acres," AR02843, that it had established an AML of zero for the

disputed territory, AR00547, and that it was removing wild horses from the disputed territory

during the relevant time period, even after the adoption of the 1991 Forest Plan.  *See* AR00255

(table showing number of horses gathered between 2003 and 2013 from grazing allotments that

overlap with the disputed territory, including Timbered Mountain, Big Sage, Carr, Triangle, and

Boles).  Thus, the Court finds that it was reasonable for the Forest Service to determine that

correcting the boundary description would not result in a significant change in the goals for and

use of the Devil's Garden WHT, and that it was not required to amend the Forest Plan or go through the more rigorous public-approval process. Accordingly, the Court finds that the Forest Service complied with the NFMA, and defendants are entitled to summary judgment on Count II.

> **D.    The Forest Service complied with NEPA, and its decision-making process was not tainted by the involvement of the Farm Bureau.**

The National Environmental Policy Act "requires that all 'proposals for major federal action significantly affecting the quality of the environment must be accompanied by a detailed discussion of the reasonably foreseeable effects on the environment of reasonable alternative courses of action.'" *Hammond*, 370 F. Supp. 2d at 239, quoting *Taxpayers Watchdog v. Stanley*, 819 F.2d 294, 298 (D.C. Cir. 1987). "This requirement is 'essentially procedural'; as long as the agency's decision is 'fully informed' and 'well-considered,' it is entitled to judicial deference." *Id.* at 239–40, quoting *Nat. Res. Def. Council v. Hodel*, 865 F.2d 288, 294 (D.C. Cir. 1988).

Plaintiffs challenge the boundary correction under NEPA on two separate grounds. First, they allege that the 2013 EA does not adequately analyze the environmental impact of eliminating the disputed territory from the Devil's Garden WHT, and thus, the Forest Service's decision to issue a FONSI instead of an EIS was improper. Pls.' Mem. at 29–33. And second, they contend that the involvement of the Farm Bureau in the NEPA process tainted the outcome. *Id.* 31–34; Pls.' Reply at 26–29. The Court finds that neither argument is persuasive.

> **1.    The Forest Service reasonably determined that the boundary correction would not significantly affect the quality of the human environment under NEPA.**

Plaintiffs argue that the 2013 EA "contains no *analysis* as to the basis for eliminating" the disputed territory and "does not even purport to assess the environmental impacts" caused by that removal. Pls.' Mem. at 30. Thus, they contend that the Forest Service's issuance of a FONSI, instead of an EIS, was improper. *Id.* at 33–35.

The D.C Circuit has identified the following criteria for a court reviewing an agency's decision to forego the preparation of an EIS:

> First, the agency must have accurately identified the relevant environmental concern.  Second, once the agency has identified the problem it must have taken a "hard look" at the problem in preparing the EA.  Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding.

*Sierra Club v. U.S. Dep't of Transp.*, 753 F.2d 120, 127 (D.C. Cir. 1985).  The Court finds that the Forest Service complied with these requirements and with NEPA, and that its decision to issue a FONSI instead of an EIS with regard to the 2013 boundary correction was reasonable.

First, the Forest Service examined the relevant environmental concern with respect to the border adjustment – the potential impact on wild horses living in the Devil's Garden WHT – and second, it took the necessary "hard look" at the issue while preparing the EA.  *See* AR00252–83 (examining "affected environment" and "environmental impacts" of the various alternatives proposed in the 2013 EA on the wild horse population); *see also* AR00171 (explaining that the amendment "[e]stablish[es] a boundary for the WHT based on the long-term needs of the Devil[']s Garden wild horse herd and within the herd's known territorial limits").  In light of its finding that the boundary adjustment simply corrected an administrative error and resulted in the continued management of the disputed territory as distinct from the Devil's Garden WHT, the Court finds that the Forest Service made a convincing case for its determination that "this amendment has no effect on wild horses or their habitat."  AR00271.

"[F]ederal agencies have discretion to decide whether a proposed action is significant enough to warrant preparation of an EIS . . . ."  *Grand Canyon Trust v. FAA*, 290 F.3d 339, 341–42 (D.C. Cir. 2002) (internal quotation marks omitted).  Here, the Forest Service reasonably determined that correcting the references to the boundaries of the Devil's Garden WHT would not

have any significant environmental impact, because the management of the Devil's Garden WHT would remain the same and because no territory was actually being removed from the wild horse range.  Plaintiffs' disagreement with the Forest Service's decision is not sufficient grounds for this Court to find that its action was arbitrary and capricious or in violation of NEPA.  *See, e.g.*, *Found. on Econ. Trends v. Lyng*, 817 F.2d 882, 886 (D.C. Cir. 1987) ("[T]he political process, and not NEPA, provides the appropriate forum in which to air policy disagreements."), quoting *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 777 (1983).

> **2.    Plaintiffs fail to show that the NEPA analysis was predetermined or tainted by a conflict of interest due to the Farm Bureau's involvement.**

Plaintiffs also allege that the results of the NEPA analysis and the decision to eliminate the disputed territory from the Devil's Garden WHT were predetermined and tainted by the Farm Bureau's involvement, and that the Forest Service's decision should therefore be vacated.  Pls.' Mem. at 31–34; *see also id.* at 12–13.  They contend that "[o]nce the Farm Bureau signed on . . . the Forest Service immediately reversed itself" on whether the disputed territory was part of the Devil's Garden WHT, and that it contracted "with the Farm Bureau to prepare a FONSI before the NEPA process had even started."  Pls.' Reply at 27.

The standard for proving that a NEPA outcome was predetermined is high: "predetermination occurs only when an agency *irreversibly* and *irretrievably* commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome."  *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 70 (D.D.C. 2012), quoting *Forest Guardians v. U.S. Fish and Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010); *see also Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 663 F.3d 476, 488 (D.C. Cir. 2011) ("[A]n individual should be disqualified from rulemaking only when there has been a clear and convincing showing that the . . . member has an unalterably closed mind on matters critical to the disposition of the

proceeding."), quoting *C & W Fish Co., Inc. v. Fox*, 931 F.2d 1556, 1564 (D.C. Cir. 1991).  "An agency can have a preferred alternative in mind when it conducts a NEPA analysis."  *Forest Guardians*, 611 F.3d at 712, citing 40 C.F.R. § 1502.14(e); *see also Comm. of 100 on Fed. City v. Foxx*, No. 1:14-CV-01903 (CRC), 2015 WL 1567902, at *9 (D.D.C. Apr. 7, 2015) ("Bias towards a preferred outcome does not violate NEPA so long as it does not prevent full and frank consideration of environmental concerns."), citing *NRDC v. Nuclear Regulatory Comm'n*, 547 F.2d 633, 659 n.5 (D.C. Cir. 1976) (Tamm, J., concurring).  "The test of compliance . . . then, is one of good faith objectivity rather than subjective impartiality."  *Forest Guardians*, 611 F.3d at 712, quoting *Envtl. Def. Fund, Inc. v. Corps of Eng'rs of U.S. Army*, 470 F.2d 289, 296 (8th Cir. 1972).

Plaintiffs contend that the Forest Service's contract with the Farm Bureau shows that the Forest Service agreed that it would prepare a FONSI, instead of an EIS, before the NEPA process had even started, meaning that the Forest Service preemptively determined that there would be no significant environmental impact from the boundary correction before engaging in the required analysis.  Pls.' Reply at 27, citing AR04714.  The contract, signed in August of 2012, does state that the Forest Service shall "Prepare Decision Notice and Finding of No Significant Impact – summer 2013."  AR04714.  However, it also shows that the Forest Service was obligated to review the Farm Bureau's specialists' reports, review the draft EA and post the final EA, and employ its own decision maker prior to preparing the decision notice and FONSI.  *Id.*  Each of these steps in the process would have provided the Forest Service with an independent opportunity to reevaluate whether a FONSI was proper or whether an EIS was required instead.  *Cf. Davis v. Mineta*, 302 F.3d 1104, 1113 (10th Cir. 2002) (finding that agency "failed to conduct a sufficient independent review of [the contractor's] work to insulate itself from the biases toward a FONSI reflected in

Case 1:14-cv-00485-ABJ   Document 32   Filed 09/30/15   Page 31 of 50

[the contractor's] draft EA"). Thus, without more, the Court does not find that this one line in the contract shows that the Forest Service "irreversibly and irretrievably" committed itself to issuing a FONSI instead of an EIS prior to completing the required NEPA analysis.

In addition to their predetermination claim, plaintiffs allege that the involvement of the Farm Bureau represented a conflict of interest that so compromised the NEPA process that the 2013 EA and FONSI should be invalidated. Pls.' Mem. at 32; Pls.' Reply at 27–29. Specifically, plaintiffs complain that "[t]he Farm Bureau has an inexorable conflict of interest relating to the outcome of the boundary modification (and the AML reduction), due to the grazing permits held by its members, who freely admit having vested financial interests adverse to wild horses in the WHT." Pls.' Mem. at 32.

In assessing whether a conflict of interest should invalidate the results of a NEPA analysis, the ultimate question is whether the "objectivity and integrity of the NEPA process" has been compromised. *Ass'ns Working for Aurora's Residential Env't v. Colo. Dep't of Transp.*, 153 F.3d 1122, 1129 (10th Cir. 1998), quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 202 (D.C. Cir. 1991). Agency oversight of the contractor's work and independent review procedures can mitigate the potential influence that may arise from a conflict of interest. *See id.* (finding that "the degree of supervision exercised by [the agency] protected the integrity and objectivity" of the NEPA process where the agency "independently and extensively reviewed all of the Contractor's analyses, commented on the Contractor's field data and written product, noted deficiencies in the data and analysis, gave direction to the Contractor's work, and frequently required the Contractor to gather more facts or perform supplemental analysis on aspects of the project").

For many of the same reasons discussed above, the Court finds that the "objectivity and integrity of the NEPA process" was not tainted by the involvement of the Farm Bureau in the

31

preparation of the draft and final EA.  As the parties' contract indicates, while the Farm Bureau

was responsible for collecting, evaluating, and summarizing data, preparing specialist reports,

providing a draft EA, submitting the draft EA for public comment, and finalizing the EA, *see*

AR04713, the Forest Service employed its own specialist to review the Farm Bureau's specialists'

reports, reviewed and commented on the draft EA, employed its own decision maker, and imposed

"quality control" for "NEPA compliance" throughout this process.  AR04714.  As in the *Aurora*

case, the "degree of supervision exercised" by the Forest Service here indicates that any conflict

of interest posed by the Farm Bureau was properly minimized.  *See* 153 F.3d at 1129.

Other than general speculation about the motives the Farm Bureau's members based on

their alleged "vested financial interests adverse to wild horses," Pls.' Mem. at 32, plaintiffs do not

offer any evidence to show that the Forest Service's review of the Farm Bureau's specialists'

reports and draft EA was in any way tainted, or that there was an "agreement, enforceable promise

or guarantee of future work" that would give rise to a conflict of interest.  *Aurora*, 153 F.3d at

1128.  They have not "pointed to any inaccuracies" in the draft or final EA, but have "merely

speculated" that the Farm Bureau's involvement was improper "due to the interests of the

proponents."  *See Nat'l Wildlife Fed'n v. FERC*, 912 F.2d 1471, 1485 (D.C. Cir. 1990).  "Such a

speculation, without more, is insufficient to undermine the [Forest Service's] independent

determination" that a FONSI was the appropriate approach under NEPA.  *See id.* at 1485–86

(rejecting challenge to agency's reliance on data provided by an engineering firm with a purported

conflict of interest, where the plaintiff "merely speculated" that the data was unreliable "due to the

interests of the proponents of the evidence").  Moreover, all of plaintiffs' claim about the Bureau's

vested interest in eliminating the Forest Service's management of the wild horses in the disputed

territory have little force, given the record evidence that the agency was not managing the horses there in the first place – especially on the privately-owned portions.

Thus, the Court finds that plaintiffs have not shown that the outcome of the NEPA process was predetermined or that a conflict of interest tainted the result. And because the Court has determined that the Forest Service otherwise complied with NEPA in developing its 2013 EA and FONSI, it also finds that defendants are entitled to summary judgment on Count III.

## II.   The Forest Service's decision to adjust the AML range for the Devil's Garden WHT was not arbitrary and capricious.

In Counts IV, V, and VI, plaintiffs object to the Forest Service's decision to broaden the appropriate management level range for the Devil's Garden WHT from 275 to 335 animals to a new AML range of 206 to 402 animals. Compl. ¶¶ 75–91. The 2013 EA provides for a range of 105 to 183 horses in the Western portion of the territory and a range of 101 to 219 horses in the Eastern portion. AR00124.

Plaintiffs contend that the removal of the disputed territory renders the low-end of the new AML range invalid *per se* under the Wild Horses Act. *See* Pls.' Mem. at 39–40. Plaintiffs also assert that the Forest Service's decision to move forward with the 2013 Management Plan, without formally amending the 1991 Forest Plan, and their failure to take a "hard look" at issues of genetic viability and livestock grazing violate the NFMA and NEPA, respectively. *See id.* at 40–45. But because the Court finds that the Forest Service reasonably determined that the disputed territory was never formally incorporated into the WHT, it finds that defendants are entitled to summary judgment on Count IV. And because the Court further concludes that the Forest Service adequately analyzed the environmental issues associated with the new AML range and determined that they were not significant, defendants are also entitled to summary judgment on Counts V and VI.

**A.    The Forest Service complied with the Wild Horses Act in adjusting the AML for the Devil's Garden WHT.**

Plaintiffs contend that "the adoption of an AML of zero for the [disputed territory] was legally impermissible" because the AML evaluation "present[ed] no genuine analysis" of the disputed territory.  Pls.' Mem. at 39–40.  But as with Counts I, II, and III, this claim is entirely contingent upon a finding that the Forest Service acted improperly by removing the disputed territory from the Devil's Garden WHT, as plaintiffs appear to recognize in their memorandum. *See id.* at 39 ("*If the Court finds that the Forest Service's elimination of the [disputed territory] was unlawful*, then the new reduced AML is also defective because it is based on only those portions of the WHT that lie *outside* of the [disputed territory].") (first emphasis added).  Thus, because the Court has already found that the Forest Service reasonably determined that the disputed territory was never formally incorporated into the Devil's Garden WHT, it similarly finds that the agency had no duty to consider the disputed territory in conducting its AML analysis or to establish a non-zero AML for that territory, and thus, this aspect of Count IV must fail.

Although they do not expand upon this argument in their summary judgment pleadings, plaintiffs also allege in the complaint that the Forest Service failed "to account for – much less analyze – the forage requirements of private livestock when taking the drastic action to reduce the low AML," and that its AML adjustment "violates the WHA's requirement that designated wild horse territories be devoted 'principally' to the welfare of wild horses."  Compl. ¶ 76, quoting 16 U.S.C. § 1332.  First, the Wild Horses Act makes clear that a wild horse range must be "devoted principally *but not necessarily exclusively*" to the welfare of wild free-roaming horses and burros. 16 U.S.C. § 1332(c) (emphasis added).  Thus, as the D.C. Circuit has stated, "public ranges are to be managed for multiple uses, not merely for the maximum protection of wild horses."  *Am. Horse Prot. Ass'n v. Watt*, 694 F.2d 1310, 1317 (D.C. Cir. 1982).  So the fact that there are "private cattle

and sheep grazing in the Devil's Garden WHT consuming much more forage than the relatively

small number of wild horses," Compl. ¶ 76, is not on its own incompatible with the Act.

And in any event, the Forest Service did not fail "to account for – much less analyze – the

forage requirements of private livestock," as plaintiffs contend.  *See id.*  The Forest Service

explicitly compared livestock use of the territory to wild horse use, AR00228, and it conducted a

thorough analysis of the "environmental consequences" of "livestock grazing" in the 2013 EA.

*See* AR00223–30; *see also infra* section II.C.2.  Therefore, to the extent that plaintiffs object to

the adjustment of the AML range with respect to the rest of the Devil's Garden WHT beyond the

disputed territory, based on the agency's purported failure to consider the impact of livestock

grazing, the Court finds that the AML adjustment was not arbitrary and capricious or in violation

of the Wild Horses Act, and that defendants are entitled to summary judgment on Count IV.

B.     **The Forest Service reasonably concluded that the AML range adjustment did not constitute a "significant" amendment under the NFMA.**

Plaintiffs also contend that that the Forest Service violated the NFMA because it did not

analyze whether adjusting the AML range was a "significant" change to the 1991 Forest Plan.

Compl. ¶¶ 80–84; *see also* Pls.' Mem. at 44–45; Pls.' Reply at 42–43.  They argue that "the Forest

Service was required either to formally amend/revise the 1991 Forest Plan when significantly

reducing the wild horse AML, or set forth specific evidence establishing that 'such amendment

would [not] result in a significant change in such plan.'"  Pls.' Mem. at 45 (alteration in original),

quoting 16 U.S.C. § 1604(f)(4).

The Court's review of the Forest Service's decision is "[h]ighly deferential," *AT&T Corp.*,

220 F.3d at 616, and the Court must not "substitute its judgment for that of the agency."  *State*

*Farm*, 463 U.S. at 43.  Under that standard, the Court finds that the Forest Service reasonably

concluded that the AML adjustment was not a significant change to the 1991 Forest Plan, and that

it provided sufficient justification for its decision.  In making its significance determination, the

Forest Service stated:

> The proposed amendments to remove establishment of the AML for wild
> horses from the Forest Plan and instead delineate a process by which AML
> would be established and revised as necessary in the [territory management
> plan] would allow for a more efficient and adaptable process to meet the
> stated Forest Plan goals and objectives. . . . The proposed changes would
> make it easier to achieve Forest Plan objectives and multiple-use goals and
> would not be NFMA significant.

AR00161–62.

The 2013 EA set forth specific evidence, based on "a site-specific and in-depth evaluation

of the available population inventory, resource monitoring data, and other information," AR00370,

that the proposed AML adjustment would not significantly alter the goals and objectives for the

Devil's Garden WHT.  For example, the Forest Service concluded that the expanded AML range

would provide a greater benefit to the wild horse population over time, as compared to the previous

range:

> The AML lower limit is set to allow the wild horse population to grow at
> the average annual population growth rate to the upper limit over an
> extended period of time (four or more years) without the need for interim
> gathers to remove excess animals.  This should lead to fewer gathers to
> maintain wild horse population size over time.  Fewer animals also would
> need to be removed during each gather.  Less frequent gathers would result
> in less stress to individual animals and the herd and fewer potential impacts
> to the herd's social structure as compared to the existing situation.

AR00553.

Plaintiffs point to nothing that would contradict the Forest Service's finding that the

adjusted AML range would benefit the wild horse population and would not alter the goals and

objectives of the 1991 Forest Plan, other than their own speculation that the new ALM range would

lead to "two isolated, inbred populations with serious genetic issues."  Pls.' Reply at 42.  Their

assessment is contradicted by the Forest Service's prediction that the average population of wild

horses under the new AML range is actually expected to be higher than the population would have been under the prior AML range.  *Compare* AR00272 (noting that, with an AML range of 275 to 335 horses, "it is expected that animal numbers would range between 280 and 409 animals (with a median of 343 head) over the next 20 years") *with* AR00276 (noting that, with an AML range of 206 to 402 horses, "it is expected that animal numbers would range between 263 and 500 animals (with a median of 368 head) over the next 20 years").  Considering that a court must "show considerable deference . . . where the agency's decision rests on an evaluation of complex scientific data within the agency's technical expertise," *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997), and in light of the lack of any contrary evidence in the record, the Court defers to the agency's expertise.

Plaintiffs also argue that the Forest Service failed to consider the impact of grazing livestock on the Devil's Garden WHT in evaluating whether the AML range should be adjusted for the wild horses.  Compl. ¶ 82; *see also* Pls.' Mem. at 45 (stating that the Forest Service refused to address whether "a significant reduction of the wild horse AML is legally or scientifically warranted where far more of the rangeland damage and resource consumption derives from private livestock using this federally protected wild horse territory").  But as discussed, the 2013 EA demonstrates that the Forest Service did conduct an analysis of the impact of grazing livestock in determining that the AML adjustment was justified.  *See* AR00223–30; *see also infra* section II.C.2.  Thus, the Court finds that the Forest Service reasonably concluded that the AML adjustment was not significant and that formal amendment of the 1991 Forest Plan was not required, and defendants are entitled to summary judgment on Count V.

C.   **The Forest Service complied with NEPA in determining that the AML range adjustment was warranted.**

Finally, plaintiffs contend that the Forest Service violated NEPA because it failed to consider the impact of the AML adjustment on the genetic diversity of the Devil's Garden WHT horse population and failed to analyze the effects caused by livestock on the territory in setting the new AML range.  Compl. ¶¶ 85–91; *see also* Pls.' Mem. at 40–44.  The Court is not persuaded by either argument, and it finds that defendants are entitled to summary judgment on Count VI.

1.   **The Forest Service reasonably concluded that the adjusted AML range would provide for sufficient genetic diversity.**

Plaintiffs concede that "the Forest Service correctly identified genetic diversity as an environmental concern to be considered," Pls.' Mem. at 40, citing AR03911, the first step required in a NEPA analysis.  *See Sierra Club*, 753 F.2d at 127.  But they allege that the Forest Service "failed to take the necessary 'hard look' at the effect that the new AML will have" on genetic diversity in the Devil's Garden WHT, and that it also failed to conduct genetic testing of the herd prior to deciding to adjust the AML range.  Pls.' Mem. at 40–43; Pls.' Reply at 33–39.

i.   **The Forest Service took the required "hard look" at the impact of the AML adjustment on the diversity of the Devil's Garden wild horse population.**

In the 2013 EA, the Forest Service found that "[a] minimum population size of 50 effective breeding animals (i.e., a population size of about 150–200 animals) is currently recommended to maintain an acceptable level of genetic diversity within reproducing [wild horse and burro] populations."  AR00273.  The adjusted AML range for the Devil's Garden WHT, as set by the 2013 Management Plan, is 206 to 402 wild horses.  AR00124.  However, the AMLs for each portion of the territory – the Eastern and Western ranges – are set at 101 to 219 horses, and 105 to 183 horses, respectively.  *Id.*  Thus, plaintiffs contend that because "the WHT now consists of two

*isolated* units between which no genetic interchange will take place," the relevant AML is not the range for the entire Devil's Garden WHT, but the ranges for each of the two separate Eastern and Western portions of the territory.   Pls.' Mem. at 40–42.   Because those range-specific AMLs provide for less than the minimum population size of 50 effective breeding animals – or 150 to 200 total animals – for each range, and because the Forest Service failed to analyze the AML adjustment in this context, plaintiffs assert that the AML adjustment violated NEPA.  *Id.*

Under the APA, "we review scientific judgments of the agency 'not as the chemist, biologist, or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.'"  *Troy Corp.*, 120 F.3d at 283, quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976).  "[O]fficials receive significant discretion to choose the wild horse and burro populations the range can support," and this "discretion extends to choosing the target wild horse and burro populations."  *Cloud Found., Inc. v. Salazar*, 999 F. Supp. 2d 117, 125 (D.D.C. 2013), citing *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 16 (D.C. Cir. 2006).

Especially in light of the substantial deference the Court must afford to the Forest Service's scientific evaluation of these issues, it finds that the agency took the required hard look at the AML adjustment and reasonably determined that it would not have a significant impact on the genetic diversity of the Devil's Garden herd.  As a threshold matter, the Court notes that plaintiffs offer only their own unsupported opinion on the effect of the AML range adjustment, and they do not

accurately characterize the plan.[10]  The Forest Service has not, as plaintiffs contend, "drastically and permanently reduce[d] the AMLs of the two isolated wild horse populations."  Pls.' Mem. at 41.  Rather, the AML adjustment *broadens* the acceptable range of wild horses that can permissibly reside within the Devil's Garden WHT.  Thus, as noted above, the Forest Service found that the wild horse population expected to result from management within the new AML range is higher than the expected population under the prior AML range.  *Compare* AR00272 *with* AR00276.

Further, plaintiffs provide no support for their assertion that there can or will be no interaction between the horses in the Eastern and Western portions of the Devil's Garden WHT, and that the two populations will be so isolated that the two AMLs must be viewed separately.  In fact, in support of their claim that the disputed territory had been incorporated into the Devil's Garden WHT at one point, plaintiffs specifically asserted that horses range freely across the disputed territory and into and out of the two separate, non-contiguous parcels.  *See, e.g.*, Pls.' Mem. at 10 ("[T]here are 'no geographical boundaries that would normally prohibit wild horses from using the [disputed territory]' for forage and water and to travel between the eastern and western portions of the WHT."), quoting AR04133.

Given these circumstances, the Court finds that the Forest Service took a sufficiently hard look at the impact of the AML adjustment across the two non-contiguous ranges, and it reasonably

---

10    Plaintiffs contend that the Forest Service stated in the 2013 Management Plan that it will implement gathers "to achieve the lower AML limit," meaning that the wild horse population will necessarily be reduced to 105 and 101 wild horses in the West and East portions, respectively.  Pls.' Mem. at 41, citing AR00123.  But that is not what the 2013 Management Plan states:  it provides that "a lower limit of 206 wild horses should be established to provide the population *range* necessary so AML maintenance gathers would be necessary only every 4–5 years."  AR00123 (emphasis added).  This does not indicate that the Devil's Garden WHT herd will automatically be managed to the lowest possible population, as plaintiffs claim; it merely establishes the absolute minimum number of horses required to maintain a thriving horse population within the territory, as part of the overall range of the acceptable wild horse population.

found that the effects would not be significant.  In discussing the adjusted AML range, it found

that "impacts to genetic diversity would be similar" to the impact of retaining the old AML.

AR00276.  Both alternatives were "expected to retain a sufficient number of individuals *in each*

*home range* and provide for adequate movement between the areas to maintain a healthy and

genetically diverse population of wild horses over the long-term."  AR00273 (emphasis added);

AR00276.  And in response to concerns that fencing within the Devil's Garden WHT would

"prevent horses from mingling (reducing gene flow)," the 2013 EA noted that the 2013

Management Plan "call[s] for the widening of gates that would provide even greater opportunity

for animal movement" than was previously possible.  AR00365.  Therefore, the Forest Service

specifically concluded that "[t]he proposed AML, coupled with known movement of animals

between each allotment and pasture, is expected to maintain an acceptable level of genetic

diversity."  AR00553.[11]

The Court finds that this determination was reasonable in light of the record evidence.  For

example, while the 2013 Management Plan does acknowledge that "[t]here have been no studies

---

[11]    For this and other reasons, plaintiffs' reliance on this Court's decision in *Defenders of Wildlife v. Jewell*, 68 F. Supp. 3d 193 (D.D.C. 2014), *appeal docketed*, No. 14-5313 (D.C. Cir. Dec. 17, 2014), is misplaced.  In that case, the Court held that "it was unreasonable . . . for [the Fish and Wildlife Service] to determine that it was necessary for Wyoming to manage for more than ten breeding pairs and 100 wolves . . . but then accept a plan that did not commit to that" threshold.  *Id.* at 209.  The Court found the plan to be insufficient because the agency had relied on "nonbinding and unenforceable representations" made by Wyoming "when it concluded that the state's plan was adequate to ensure that the state will in fact maintain the necessary number of breeding pairs and individual wolves."  *Id.* at 207.  Here, in contrast, the Forest Service itself, and not a separate entity, will be managing the wild horse population within the adjusted AML range. And it adopted a plan that it found would sustain that threshold across the Eastern and Western ranges, due to the "known movement of animals between each allotment and pasture," AR00553, and its plan to permit the introduction of horses from one home range to another "[i]f necessary to maintain genetic diversity."  AR00100.  Thus, it is not the case here that the Forest Service "accept[ed] a plan that did not commit" to the threshold it established as necessary to maintain the genetic diversity of the Devil's Garden wild horse population.

conducted to determine the genetic health of the animals in the area," it goes on to state that "[t]here

is not . . . any indication that genetic diversity is a concern."  AR00128; *see also* AR00260 (2013

EA noting that, "[b]ased on observations of animals gathered and removed from the WHT, no

problems have been identified that could be attributed to poor genetic health").  Further, the Forest

Service has consistently found the wild horse population within the Devil's Garden WHT to be

healthy and sufficiently genetically diverse in the past.  *See, e.g.*, AR02974 (1975 Management

Plan noting that "[g]eneral health of the animals appears to be exceptionally good"); AR02847

(1982 Management Plan noting same); AR00641 (2012 Resource Monitoring Report noting that

"[h]orse populations appear diverse and healthy"); AR00365 (2013 EA noting that "no potential

impacts to genetic diversity (inbreeding) have been observed.").

And even if there turns out to be limited interaction between the two separate populations,

the Court finds that it was reasonable for the Forest Service to determine that the adult breeding

population of the Eastern and Western ranges – the number of "[w]ild horses within a population

that are 1 years of age and older," AR02177 – will still be sufficient to maintain genetic diversity.

The effective population size – the number of effective breeding animals required "for

maintenance of genetic variation in endangered species or managed populations" – is 50 animals.

AR01414.  Because "the effective population size is *generally* 1/4th to 1/3rd of the census

population," "a census population size of 150 to 200 is required to achieve the minimum effective

population size."  *Id.* (emphasis added).  In other words, for genetic diversity to be maintained,

each of the two home ranges must have a census population generally within the range of 150 to

200 *total* horses.

Importantly, while the census population comprises all horses within the territory, the AML

reflects only "[t]he number of adult horses" to be managed within a territory, AR02177, excluding

the current year's foals.  AR00177.  Thus, the AML ranges established in the 2013 Management Plan – 101 to 219 horses in the Eastern range, and 105 to 183 horses in the Western range – reflect only the adult horses in those ranges, and do not account for the foals present in the herd.

Plaintiffs speculate that *if* there is no crossover between the populations on the Eastern and Western ranges, and *if* the Forest Service manages each range's adult population to the absolute minimum of the AML range, and *if* the rate of foals born each year remains constant, then "the total populations in both the West unit (140 horses) and the East unit (135 horses) would be *below* the Forest Service's own 'absolute minimum' threshold" of 150 total horses.  Pls.' Reply at 33–34.  But as discussed above, there is no indication in the record that the wild horse population will in fact be managed to the lowest number allowed by the adjusted AML range, and in any event, the Forest Service specifically concluded that the AML range is "expected to retain a sufficient number of individuals *in each home range* . . . to maintain a healthy and genetically diverse population of wild horses over the long-term."  AR00273 (emphasis added); AR00276.  "[T]he 'agency's evaluations of scientific data within its area of expertise'" are "entitled to a 'high level of deference,'" *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1320 (D.C. Cir. 1998), quoting *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1490 (D.C. Cir. 1995), and the Court finds that deference to be warranted here.

Thus, the Court concludes that the Forest Service has shown a rational connection between the facts it found relating to the genetic health of the horse population within the Devil's Garden WHT and its decision to expand the AML range to 206 to 402 wild horses.

> ii.     **The Forest Service was not required to perform genetic testing prior to adjusting the AML range.**

Plaintiffs also complain that the Forest Service "undertook no genetic study *before* deciding to adopt" the new AML range, and they challenge the agency's decision "to conduct

genetic sampling '[d]uring the initial removal(s) to achieve [the new] AML'" instead.  Pls.' Mem. at 41, quoting AR00125.  They concede that "NEPA does not require an agency to conduct genetic testing prior to the issuance of an EA," but they assert that where, as here, "the AML range is being reduced to a level below the agency's *own* minimum safeguards, it is arbitrary and capricious to do so in the absence of genetic testing or other evidence indicating that the decision will *not* result in the types of harms predicted" from a lack of genetic diversity.  Pls.' Reply at 35.

Under NEPA, "[d]etailed analysis is required only where impacts are likely.  Where adverse environmental impacts are not likely, expensive and time-consuming studies are not necessary."  *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 377 (D.C. Cir. 1981), citing *Carolina Envtl. Study Grp. v. United States*, 510 F.2d 796, 799 (D.C. Cir. 1875); *see also Tinicum Twp., Pa. v. U.S. Dep't of Transp.*, 685 F.3d 288, 296 (3d Cir. 2012) ("NEPA does not require maximum detail.  Rather, it requires agencies to make a series of line-drawing decisions based on the significance and usefulness of additional information"), citing *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987).  Here, the Court finds that the agency reasonably determined that no genetic study was required, based on the observed health of the horse population and the fact that adverse environmental impacts from the adjustment were unlikely.

As noted above, the Forest Service rationally concluded that the adjusted AML ranges for the Eastern and Western portions of the Devil's Garden WHT would maintain wild horse populations at or above the required census population to ensure the genetic diversity of the herd. And the Forest Service identified "other evidence" indicating that the adjusted AML poses little risk to the herd's genetic survival.  "Based on observations of animals gathered and removed from the WHT," the Forest Service found that "no problems have been identified that could be attributed to poor genetic health" among the Devil's Garden herd.  AR00260.  For that reason, it reasonably

determined that conducting a genetic test of the herd prior to implementing the adjusted AML range was unnecessary.  *See id.* ("Genetic diversity has not been sampled within the WHT").

Even with this observation, the Forest Service implemented safeguards to ensure that the genetic diversity of the Devil's Garden herd does not dip below acceptable levels.  The 2013 EA states that "[b]aseline genetic diversity would be determined by sampling a portion of the herd during the first gather cycle," and "[f]urther samples would be taken at a minimum of every other gather (e.g., 8–10 years) to detect any change in genetic diversity from the baseline."  AR00176.  As the expert relied upon by the Forest Service stated, it takes 1 or 2 generations – or about 10 to 20 years, *see* AR00176 – for a significant loss of diversity to occur.  AR01414.  Thus, if samples will be taken at the first gather and then every 8 to 10 years, then the diversity of the Devil's Garden herd will be assessed at a minimum of once every generation.

And if the genetic diversity value for the herd falls outside of acceptable ranges, the Forest Service will implement the following management actions:  "maximizing the number of breeding age wild horses (animals aged 6–10 years) within the herd, adjusting the sex ratio in favor of males to increase the number of harems and effective breeding males, and releasing 1–2 young mares from similar habitats every generation (about 10 years)."  AR00176.  Thus, this is not a situation where, as plaintiffs claim, "the agency's promise to conduct 'comprehensive' genetic testing every 8–10 years will likely be too little, too late [because] the irreversible damage to the population's gene pool will already have been inflicted."  *See* Pls.' Reply at 34–35, quoting Defs.' Reply at 38.

Plaintiffs point to no material from which the Court could conclude that the Forest Service's observations of a healthy and genetically diverse population were contrary to record evidence.  And they have not convinced the Court that the Forest Service acted unreasonably in determining that adverse impacts to the genetic diversity of the wild horse population were not

"likely," and that a genetic study was therefore not warranted.  Thus, the Court finds that the Forest

Service complied with NEPA in assessing the potential impacts the AML adjustment would have

on the genetic diversity of the Devil's Garden wild horse population.

> **2.      The Forest Service properly analyzed the cumulative impact of livestock on conditions in the Devil's Garden WHT.**

Under NEPA, "depending on the environmental concern at issue, the agency's EA must

give a realistic evaluation of the total impacts and cannot isolate a proposed project, viewing it in

a vacuum."  *Grand Canyon Trust*, 290 F.3d at 342.  Plaintiffs claim that the Forest Service

"lowered the AML for wild horses . . . without undertaking *any* analysis of the contributory impacts

of the substantial number of livestock that graze the WHT lands."  Pls.' Mem. at 43; *see also* Pls.'

Reply at 39–42.  But the record shows that this allegation is unfounded.  Instead, the Court finds

that the 2013 EA shows that the Forest Service also took the required "hard look" at the cumulative

impacts of wild horse and livestock grazing in reaching its decision to adjust the AML range.

The 2013 EA identified "livestock grazing" as one of "several ongoing and future

activities . . . that are not specifically related to the management of the Devil's Garden Plateau

wild horses but may contribute to cumulative effects."  AR00199–200.  It identifies "grazing" as

one of the "desired conditions identified in the 1991 Forest Plan," and its summary of those desired

grazing conditions appears to embrace balancing the interests of livestock and wild horses:

> Manage grazing use in a manner that achieves and maintains satisfactory ecological condition and protects soil, water, and streamside-dependent resources.  Forage is made available for use by livestock, wild horses and wildlife.  Actual grazing use by livestock, wild horses and wildlife remains in balance with the available capacity.

AR00168.

Further, the 2013 EA summarized historic and current livestock use of the Devil's Garden

WHT and discussed the grazing allotments within the WHT affected by the proposed changes.

AR00223–28.   It also compared the permitted, authorized, and actual use of the territory by

livestock with the allocated and actual use by wild horses.   AR00227; *see also* AR00259 (chart

comparing actual and permitted livestock use to wild horse use for allotments within the Devil's

Garden WHT from 2006 to 2012); AR00363–64 (observing that "actual use by livestock during

2006–2012 averaged 18,548 AUMs or 69% of that permitted," but that "[d]uring the same period,

use by wild horses averaged 10,257 AUMs or 233% of the AUMs [animal unit months] allocated

for wild horses").   And it analyzed the environmental impacts of each of the four proposed actions

and examined the direct, indirect, and cumulative effects of each action, including how each would

impact forage availability and livestock grazing.   AR00228–30.

Ultimately, the 2013 EA found that the proposed action – the boundary correction and the

AML range adjustment – would result in "the reallocation of 1,390 AUMs from permitted

livestock to wild horse forage if found necessary," and that "reduced competition between

livestock and wild horses for the available forage and water would be expected."   AR00229; *see*

*also* AR00195–96 (listing "livestock grazing" as a "potential impact to social and economic

factors" and noting that, under the proposed action, "an estimated 1,390 AUMs of livestock forage

could be lost due to the increase in authorized wild horse use (AML)").   Thus, the Court finds that

the 2013 EA does not consist of "a mere listing of activities" that lacks "an analysis of the *impacts*

of these activities," as plaintiffs allege.   *See* Pls.' Reply at 39, quoting *Defs. of Wildlife v. Babbitt*,

130 F. Supp. 2d 121, 127 n.8 (D.D.C. 2001).   Rather, the effects of wild horse and livestock grazing

were "considered together" in the 2013 EA so that the Forest Service "could determine the

combined impact" of those animals on the territory.   *See Fund for Animals v. Clark*, 27 F. Supp.

2d 8, 14 (D.D.C. 1998).

To the extent that plaintiffs contend that the Forest Service was required to consider modifying livestock grazing levels instead of, or in addition to, adjusting the AML range for the wild horse population in the 2013 EA, *see* Pls.' Mem. at 43–44; Pls.' Reply at 39 ("[T]he agency admits that it never asked the most obvious question:  are there too many cattle in the WHT?"), that is beyond the scope of what NEPA requires.  The cumulative impact analysis under NEPA is designed to identify "the incremental impact of *the action [at issue]* when added to other past, present, and reasonably foreseeable future actions."  *Dole*, 826 F.2d at 70 (emphasis added), quoting 40 C.F.R. § 1508.7.  Federal agencies have "broad discretion in determining how best to handle related, yet discrete, issues in terms of procedures and priorities" and "need not solve every problem before [them] in the same proceeding."  *Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 230–231 (1991) (internal citations omitted).

Here, the action at issue was the management of the wild horses living within the Devil's Garden WHT, and not the modification of grazing permits for livestock, which is addressed through a separate process.  *See* AR00202 ("The Forest Service and the BLM will manage livestock grazing in compliance with the standards and guidelines in their land management plans and grazing permit terms and conditions.  These determine the timing, duration, and intensity of grazing.").  Thus, while the 2013 EA clearly contemplated some adjustment to the permitted grazing levels within the territory, *see* AR00248 ("Managing wild horse population size within the established AML, *coupled with some adjustments in the authorized livestock grazing use*, would be expected to meet Forest Plan utilization standards and achieve the desired conditions.") (emphasis added), because the 2013 EA "address[ed] population levels for wild horses only," the Forest Service stated that "[a]ny necessary adjustment to livestock management and/or use levels are outside the scope of this document and will be addressed . . . during the grazing permit renewal

process." AR00364.  This approach is consistent with NEPA.  *See, e.g.*, *Grunewald v. Jarvis*, 776 F.3d 893, 904–06 (D.C. Cir. 2015) (finding that agency did not violate NEPA when it declined to analyze an exotic plant management plan in the same EIS as a deer management plan and instead maintained them as "distinct actions addressed in two different planning efforts") (internal quotation marks omitted).

Plaintiffs complain that the Forest Service is guilty of a "bait-and-switch:  the agency assessed the impacts of a horse population at historically high levels in order to justify reducing the AML to a historically low range."  Pls.' Reply at 40–41.  But whatever the reason for the high wild horse population at the time the Forest Service decided to adopt the 2013 changes, agency "officials receive significant discretion to choose the wild horse and burro populations the range can support," and this "discretion extends to choosing the target wild horse and burro populations." *Cloud Found.*, 999 F. Supp. 2d at 125, citing *Fund for Animals*, 460 F.3d at 16.  The Court has found no reason to disturb that exercise of discretion here.

Plaintiffs may disagree with the Forest Service's decision to adjust the AML range instead of modifying grazing permits and livestock management plans, but "NEPA is 'not a suitable vehicle' for airing grievances about the substantive polices adopted by an agency, as 'NEPA was not intended to resolve fundamental policy disputes.'"  *Grunewald*, 776 F.3d at 903, quoting *Lyng*, 817 F.2d at 886.  Based on the record before it, the Court finds that the Forest Service took a hard look at the relevant factors and articulated a rational connection between the facts it found and its decision to adjust the AML range for the Devil's Garden WHT.  Thus, defendants are entitled to summary judgment on Count VI.

**CONCLUSION**

Because the Forest Service reasonably concluded that the disputed territory was never formally incorporated into the Devil's Garden WHT, and that any references to one contiguous territory were the result of administrative error, the Court finds that it was not arbitrary and capricious or in violation of the law for the Forest Service to act to correct the boundary in the 2013 EA and the 2013 Management Plan.  Thus, defendants are entitled to summary judgment on Counts I, II, and III.  And because the Forest Service articulated a rational basis for its decision to adjust the AML range for the Devil's Garden WHT that was not counter to record evidence or otherwise contrary to the law, the Court finds that defendants are also entitled to summary judgment on Counts IV, V, and VI.  Thus, plaintiffs' motion for summary judgment will be denied, defendants' cross-motion for summary judgment will be granted, and because they seek the same relief as defendants, the intervenor-defendants' cross-motion for summary judgment will be denied as moot.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  September 30, 2015